UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KAREN L. HENSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:14 CV 653 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Karen L. Henson under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Because the Commissioner's decision is not supported by substantial evidence on the record as a whole, it is reversed.

## I. BACKGROUND

Plaintiff was born on October 19, 1960. (Tr. 15.) On October 1, 2008, she filed her application for child's disability insurance benefits on October 1, 2008, under Title II of the Act, on the wage earner account of decedent Allen Lang. (Tr. 217.) She initially alleged an onset date of her disability of October 19, 1968 (id.), but amended it to March 7, 1979. (Tr. 148-49). She alleges that prior to the time she attained 22 years of age she was unable to work due to schizophrenia, mood swings, depression, anxiety ("schizoaffective disorder"), trouble with reading and writing, and problems learning ("borderline intellectual functioning"). (Tr. 13, 92, 270.) Plaintiff's application was denied and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 113-14.)

The ALJ held a hearing on December 21, 2009, and issued a decision unfavorable to plaintiff on March 4, 2010. (Tr. 70-81, 90-94.) The Appeals Council granted the plaintiff's request for review on April 29, 2011 and remanded the case to the ALJ with instructions to: 1) address claimant's amended onset date; 2) address claimant's request to retrieve her 1992 SSI approval file; 3) evaluate claimant's mental health impairments in accordance with the special technique, and document this application with specific findings and an appropriate rationale for each of the function areas; and, 4) evaluate claimant's impairments according to the prescribed sequential process. (Tr. 99-100.)

The ALJ held a second hearing on October 9, 2012 and issued a second decision unfavorable to plaintiff on December 27, 2012. (Tr. 13-22, 29-67.) The Appeals Council denied review on February 4, 2014, and therefore the second decision of the ALJ is the final decision of the Commissioner. 20 C.F.R § 404.984(d).

## II. MEDICAL AND EDUCATIONAL HISTORY

An intelligence test was conducted when plaintiff was 14 years old and indicated an overall score of 77. Her educational records from 1975-1978, while she was attending Saint Charles High School, indicated satisfactory or very satisfactory for almost all classes, except math and typing, which were always Cs. She transferred to Wentzville High School where she earned her high school diploma, earning As and Bs. Three credits at Wentzville were labeled as "work study". (Tr. 296-98.)

On March 7, 1979, plaintiff was assessed at Malcolm Bliss Hospital for social services. Plaintiff reported being hospitalized as an alternative living arrangement whenever something does not work out at her current home. She reported being hospitalized several times, the last time being in 1975. (Tr. 322-24.)

Between March 3 and April 4, 1979, plaintiff missed three appointments with her mental health provider at Malcolm Bliss Hospital. On May 9, 1979, plaintiff reported to William Riedesel, M.D., that she wanted to check into a hospital, although she denied

having suicidal or homicidal thoughts and she was not decompensating at the time. She was referred to social services for temporary shelter in St. Charles. (Tr. 323.)

On May 18, 1979, plaintiff was diagnosed with depression and saw Dr. Riedesel at Malcolm Bliss Hospital in St. Charles, Missouri, four times through February 11, 1980. On February 18, 1980, plaintiff was diagnosed with adjustment disorder with a depressive mood. Plaintiff missed her appointment on February 25, 1980. (Tr. 316-21.)

On August 18, 1980, the last records from Dr. Riedesel indicate she cannot take medications due to her pregnancy. She was still diagnosed with an adjustment disorder with depressed mood. Plaintiff's records were then transferred to the Crider Mental Health Center. (Tr. 315.)

There are no additional medical records from the time in question, 1978-1982. Plaintiff has provided documentation from Barnes Jewish Hospital, St. Joseph Health Center-St. Charles, Missouri Division of Vocational Rehab, Crider Health Center, and St. Louis Children's Hospital showing an attempt to recover her records, but that these institutions did not retain records for this amount of time. (Tr. 327, 332, 345-49, 352.) Any medical records that were a part of her 1992 SSI approval proceeding appear to have been lost (Tr. 233, 302.)

Plaintiff's records restart on October 9, 2008, when she applied for the Title II benefits at issue in the present case and completed an adult function report. Plaintiff reported not being able to stand easily, and having numbness and weakness in legs and left arm. She asserts she can only take basic care of herself and must have her home health aide assist her on all things. She cannot lift, walk, climb stairs, stand, squat, bend, kneel, use her hands, or reach. (Tr. 255-65.)

On February 4, 2009, Sonjay Fonn, M.D., of Midwest Neurosurgeons reported plaintiff complained of back pain with paresthesias, or a pins and needle sensation, in her legs. He diagnosed her with degenerative disk disease at L5/S1 with a small disc herniation, an abnormal bulge in the lower section of the back. Plaintiff's diabetes is a

having suicidal or homicidal thoughts and she was not decompensating at the time. She was referred to social services for temporary shelter in St. Charles. (Tr. 323.)

On May 18, 1979, plaintiff was diagnosed with depression and saw Dr. Riedesel at Malcolm Bliss Hospital in St. Charles, Missouri, four times through February 11, 1980. On February 18, 1980, plaintiff was diagnosed with adjustment disorder with a depressive mood. Plaintiff missed her appointment on February 25, 1980. (Tr. 316-21.)

On August 18, 1980, the last records from Dr. Riedesel indicate she cannot take medications due to her pregnancy. She was still diagnosed with an adjustment disorder with depressed mood. Plaintiff's records were then transferred to the Crider Mental Health Center. (Tr. 315.)

There are no additional medical records from the time in question, 1978-1982. Plaintiff has provided documentation from Barnes Jewish Hospital, St. Joseph Health Center-St. Charles, Missouri Division of Vocational Rehab, Crider Health Center, and St. Louis Children's Hospital showing an attempt to recover her records, but that these institutions did not retain records for this amount of time. (Tr. 327, 332, 345-49, 352.) Any medical records that were a part of her 1992 SSI approval proceeding appear to have been lost (Tr. 233, 302.)

Plaintiff's records restart on October 9, 2008, when she applied for the Title II benefits at issue in the present case and completed an adult function report. Plaintiff reported not being able to stand easily, and having numbness and weakness in legs and left arm. She asserts she can only take basic care of herself and must have her home health aide assist her on all things. She cannot lift, walk, climb stairs, stand, squat, bend, kneel, use her hands, or reach. (Tr. 255-65.)

On February 4, 2009, Sonjay Fonn, M.D., of Midwest Neurosurgeons reported plaintiff complained of back pain with paresthesias, or a pins and needle sensation, in her legs. He diagnosed her with degenerative disk disease at L5/S1 with a small disc herniation, an abnormal bulge in the lower section of the back. Plaintiff's diabetes is a

significant factor in her back problems. Physical therapy was recommended, but she declined, and surgery was not recommended at that time. (Tr. 338.)

On February 12, 2009, plaintiff underwent an annual evaluation of her mental health status. Social worker Deborah Cole and licensed counselor Kristi Peirce reported plaintiff's depression continued, she heard voices, and saw other people "watching over her." She has anxiety and avoids leaving her house and does not like groups. Plaintiff was taking Lorazepam (for anxiety), Invega (for mood disorders), Cymbalta (for fibromyalgia), and Ativan (for anxiety). Plaintiff was diagnosed with schizoaffective disorder, borderline intellectual functioning, and a GAF[1] score of 41.[2] (Tr. 338.)

On February 27, 2009, Dinu P. Gangure, M.D., at Barnes Jewish Behavioral Health-Southeast completed an employment ability assessment and listed plaintiff's diagnosed illnesses as schizoaffective disorder, borderline intellectual functioning, and having a GAF of 41. Over the past year her highest GAF was 45. Plaintiff would be absent from work at least three times each month and would only have fair or poor abilities in all job and personal-social adjustment factors.[3] (Tr. 340-44.)

From February 28, 2010 through August 15, 2012, ten mental health plans were completed by plaintiff. The Barnes Jewish Mental Health department detailed her mental and physical health goals and ways to achieve them. (Tr. 395-402.)

---

[1] A GAF score helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000) ("DSM IV").

[2] A GAF score between 41 and 50 indicates serious symptoms (e.g., suicidal ideations, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM IV at 34.

[3] Occupational adjustments include: the ability to follow rules, relate to co-workers, deal with the public, understand and carry out instructions. Personal-social adjustments include: maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations. (Tr. 342-43.)

On October 27, 2010, the Barnes Jewish Mental Health department assessed plaintiff's GAF as 50. (Tr. 393.)

On October 3, 2011, Christina Gesmundo, M.D., completed a social security mental health assessment. Plaintiff was diagnosed with schizoaffective disorder. Plaintiff's current and highest GAF score for the past year was 55.[4] Dr. Gesmundo assessed that plaintiff had refractory psychosis with difficulty in reality based thinking. Plaintiff would miss at least three days of work every month and have marked and frequent problems involving daily living, social functioning, concentration, persistence or pace, and repeated decompensations. Plaintiff had only a fair or poor ability in most occupational, performance, or personal-social adjustments. (Tr. 357-61.)

On January 11, 2012, Dr. Gesmundo saw plaintiff for supportive psychotherapy. She continued plaintiff on Haldol (for mania and bipolar disorder), Benadryl (to counteract muscle spasms resulting from the side-effects of her other prescription medications), and Lexapro (for depression). (Tr. 369-70.)

On March 4, 2012, Dr. Gesmundo added Xanax (for depression) to plaintiff's medications.

On April 5, 2012, Dr. Gesmundo increased plaintiff's Lexapro prescription beyond the recommended dosage, because her depressive symptoms without psychosis were continuing. (Tr. 375-76.)

On May 3, 2012, during her psychotherapy appointment, Dr. Gesmundo changed her depression medication from Lexapro to a trial of Vilbryd because of her continuing symptoms.

On May 17, 2012, Dr. Gesmundo resumed plaintiff on Lexapro and discontinued the Vilbryd due to an adverse reaction. (Tr. 371-82.)

---

[4] A GAF score between 51 and 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM IV at 34.

At her May 30, 2012 and July 11, 2012 appointments, plaintiff reported that the Lexapro, at a level greater than the recommended dosage, was working better. Dr. Gesmundo continued her on the Haldol, Benadryl, and Xanax. (Tr. 386-92.)

On November 8, 2012, consultative psychologist Jannette Cross, Ph.D., completed a psychological evaluation and administered a WAIS-IV test to plaintiff. Dr. Cross noted plaintiff's report of her history of a chronic schizophrenia, hallucinations, paranoia, and depression. Plaintiff reported her auditory hallucinations began at age six and plaintiff's doctors started her on a course of Librium at age eight. Plaintiff has a history of cutting herself; she is depressed and worries most of the time; she has no initiative. Plaintiff reported to Dr. Cross she had been hospitalized over forty times throughout her life beginning at age eight. Additionally, plaintiff reported she was prescribed psychotropic medications and was subjected to electroconvulsive therapy throughout her youth. Dr. Cross assessed her overall IQ as 49, in the extremely low range of intellectual functioning. (Tr. 403-07.)

### III. ALJ HEARINGS

**First ALJ Hearing**

The ALJ held a hearing on December 21, 2009. (Tr. 70-81.) The plaintiff attended with her counsel and testified to the following facts.

Her symptoms began as a child and continued throughout her life. She would sit in the dark and hide in her closet. She was molested by her stepfather from the age of six through seventeen when she moved away to live with her sister after her mother's death. She was hospitalized for psychiatric reasons before she was 22. She saw Dr. Carlbalon from age eight until seventeen and was prescribed several psychotropic medications in addition to electroshock therapy. Her symptoms as a child included hiding in her closet, being too ashamed to meet new people, and having problems in school. (Tr. 73-74.)

Plaintiff was enrolled in regular classes through ninth grade but moved to special education because her grades were too low. Additionally, she had too many problems with

other students while attending regular high school classes. (Tr. 75.) Plaintiff worked for a Howard Johnson hotel as a part-time maid for approximately six months. She stated she quit because "I couldn't take it no more." While living with her sister she worked as a nurse's aide, but was fired because she refused to work with the assistance of others. (Tr. 77-78.)

Plaintiff was homeless often between the ages of 18 and 22. She was manic and depressed during this time and "wanted to be back in [her] closet again." She has had nightmares all her life which prohibit her from sleeping well. She has poor judgment which has resulted in her making decisions such as attempting to confront her stepfather, resulting in him raping her in front of her children. (Tr. 79-80.)

**First Decision of the ALJ**

On March 4, 2010, the ALJ found that the claimant was not credible regarding the severity of her limitations prior to turning 22 years old. Additionally he found that plaintiff had no medically determinable impairments prior to her turning 22 years old that would have prevented her from performing work-related activities. (Tr. 91-93.)

**Second ALJ Hearing**

The Appeals Council remanded the case to the ALJ, instructing him to 1) address the amended onset date; 2) address the request to retrieve the 1992 SSI approval file; 3) evaluate the mental impairments using the special technique described in 20 C.F.R. § 404.1520a; and 4) evaluate the impairments using the sequential process. (Tr. 99-100.)

The ALJ held a second hearing on October 9, 2012. Plaintiff's attorney noted that the file could not be made complete because the Social Security Administration had lost her previous file. The plaintiff attended the second hearing, was represented by an attorney, and testified to the following facts. (Tr. 29-69.)

Plaintiff completed high school but had to be enrolled in all special education classes. She attended a vocational college for a year, but she "wasn't cut out for it." She

describes herself as "very slow" and because of this and her concentration problems she was not very good at school. (Tr. 59.) Plaintiff can read and write, but has not worked since 1995. A home health aide has helped her for the past 12 years. She has a history of cutting herself, arthritis in her spine, and requires pain shots. (Tr. 43-45.) She has only one friend and cannot be around people because she gets nervous and anxious. Almost all household chores are done by her home health aide. (Tr. 47-48.) She is currently taking Haldol, Xanax, Lexapro, Combivent (a breathing inhaler), Voltaren cream (for arthritis pain), Lisinopril and Diovan (for high blood pressure), Plavix (a blood thinner), Benadryl (for sleeping), and Percocet (for back pain). (Tr. 52-53, 60-62.)

Plaintiff stated she lived on the streets most of the time during 1978-1982. She married her first husband but ended up back on the streets after their divorce. Her children were taken by the state of Missouri into foster care. Eventually, she relinquished her parental rights completely. Plaintiff diagnoses her problem as schizophrenia, which, to her, means she hears voices and has a short memory. Plaintiff says she heard voices as a child, throughout her teenage years and early twenties, and up until she was placed on Haldol as an adult. She states she is depressed, characterized by not wanting to get out and meet people and crying a lot. She would hide in a dark closet in order to avoid people. She claims admission to hospitals at least 43 times because she has tried to harm or kill herself many times. She had shock therapy while hospitalized at Malcolm Bliss Hospital as a child. Although she cannot remember precise dates, she is sure it happened prior to her turning 22 years of age. She has had concentration problems her entire life. Plaintiff reported having trouble walking and running but could lift at least 20 pounds. (Tr. 53-59.)

The ALJ appointed a medical expert, Nancy Winphrey, Ph.D., to opine on the plaintiff's disability from 1978-1982 based on the written records only. Dr. Winphrey stated she was uncertain about the time period in plaintiff's life she was expected to render opinions. She stated that there was not sufficient medical data for her to form an opinion on the claimant's medical status. Dr. Winphrey found schizoaffective disorder as the only

diagnosed impairment. Dr. Winphrey could not apply the paragraph B and C[5] criteria, apparently because of the lack of legible details in the few medical records from 1978-1982. (Tr. 31-33.) She stated that plaintiff's earlier WAIS score could relate to her current functioning. See Lott v. Colvin, 2014 WL 6704564, at *3 (8th Cir. Nov. 28, 2014) (IQ is presumed to remain stable over time in the absence of evidence of change in intellectual functioning). The lack of medical evidence from the time period in question resulted in her suggesting it would be helpful to have additional information regarding plaintiff's current diagnoses in order to hypothesize about plaintiff's impairments during 1978 to 1982. (Tr. 35-39.)

Finally, a Vocational Expert (VE) testified regarding the availability of work for a person with the plaintiff's various limitations. The VE and ALJ found plaintiff had no past relevant work experience and therefore no skills to transfer when considering potential employment. The ALJ described a hypothetical person, aged 22 with a high school education, no past work experience, who could perform light work (lift, carry, push, and pull 20 pounds occasionally, and 10 pounds frequently), and who could walk, sit, and stand. Furthermore, the person would be limited to simple, repetitive tasks with only occasional interaction with supervisors, coworkers, and the public. The VE testified that this person could perform work in the national and local economy. (Tr. 62-65.)

Plaintiff's attorney added additional restrictions on the hypothetical worker, including an inability to work an eight-hour workday or five-day work week due to mental impairments. The hypothetical person would be absent two or more times per month. The VE testified these limitations would make the person unemployable. Furthermore, if a person was to be off task 20 percent of the time due to her lack of concentration and focus, she would also be unemployable. (Tr. 65-66.)

---

[5] Paragraph B and C" criteria are listed in 20 C.F.R. Subpt. P, app. 1, § 12.00.

## III. DECISION OF THE ALJ

On December 27, 2012 the ALJ found plaintiff not disabled prior to October 18, 1982, when she turned 22. (Tr. 13-22.) At Step One, the ALJ found that plaintiff had not attained age 22 before her amended alleged onset date of March 7, 1979. Furthermore, the plaintiff had not engaged in substantial gainful activity since her original alleged onset date, October 19, 1968. (Tr. 15-16.)

At Step Two, the ALJ found that, prior to age 22, plaintiff suffered from two severe impairments that had more than a minimal effect on her ability to engage in work: borderline intellectual functioning and an adjustment disorder. (Tr. 16.)

At Step Three, the ALJ found that, prior to age 22, none of plaintiff's impairments, alone or in combination, met a presumptively disabling Listing under 20 CFR Part 404, Subpart P, Appendix 1. The ALJ recognized that the SSA had adjudicated plaintiff disabled for supplemental security income benefits under Title XVI of the Act beginning in October 1991, due to the combination of her affective disorder and borderline intellectual functioning, the combination of which medically equaled Listing 12.05(c). However, the ALJ found that the record of the current application does not support such a determination for the period before October 1991. The ALJ found that these impairments, either alone or combined, were not disabling prior to her reaching age 22. (Tr. 16.)

Additionally, the ALJ considered plaintiff's mental impairments in relation to "paragraph B" criteria[6] and found they were not satisfied for the period prior to age 22. Specifically, the ALJ found plaintiff had only mild restrictions in her daily living activities; no significant difficulty in social functioning; only moderate difficulties in concentration, persistence or pace; and, no episodes of extended decompensation. The ALJ generally stated he considered "paragraph C"[7] criteria, and without elaboration stated the evidence was insufficient to establish the C criteria. (Tr. 18-19.)

---

[6] "Paragraph B" criteria are listed in 20 C.F.R. Subpt. P, app. 1, § 12.00.

[7] "Paragraph C" criteria are listed in 20 C.F.R. Subpt. P, app. 1, § 12.00.

At Step Four, the ALJ considered the entire record and determined plaintiff, before age 22, had the residual functional capacity to perform work at all exertional levels, but was limited to simple and repetitive tasks. (Tr. 20-21.) The ALJ found that, although the plaintiff's medically determinable impairments could cause her alleged symptoms, plaintiff's descriptions of the symptoms' intensity, persistence, and limiting effects were not credible. The ALJ found that the overall lack of objective medical evidence, plaintiff's daily activities, and educational accomplishments discredited her subjective complaints. (Tr. 20.)

Finally, at Step Five, the ALJ, with the testimony of the VE, found work in significant numbers in both the national and state economies that plaintiff could perform prior to her attaining age 22. (Tr. 21-22.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to child's disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months between the ages of 18 and 22. 42

U.S.C. §§ 423(a)(1)(D), (d)(1)(A); 20 C.F.R. § 404.350; Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981).

## V. DISCUSSION

Plaintiff argues (1) the ALJ erred by failing to limit her RFC sufficiently due to improper findings and failing to properly analyze and weigh the medical opinions; and (2) the ALJ erred by assessing her credibility without putting his findings on the record or following applicable case law. (Pl.'s Br. 15, 19.)

### A. Plaintiff's Credibility

Plaintiff argues the ALJ improperly determined that plaintiff's statements concerning the intensity, persistence and limiting effects of her impairments' symptoms are not "entirely credible" (Tr. 20), because he did not conduct the proper analysis under Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

The determination of credibility is one left to the ALJ, if he gives good reasons for his decision. Hogan v. Apfel, 239 F.3d 958, 962 (2001). According to Social Security Ruling 96-7p, a simple conclusory statement will not suffice:

> An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence. It is not sufficient for the adjudicator to make a single conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility supported by the evidence in the case records, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for the weight.

Social Security Ruling 96-7p.

According to Polaski, the reasons for discrediting a claimant's subjective complaints must be based on testimony, prior work record, and observations by third

parties and both treating and examining physicians. 739 F.2d at 1322. The ALJ should address such factors as "1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions." Id. Although the ALJ need not discuss each factor separately, the court still will review the whole record to ensure the ALJ does not disregard evidence. See McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011). If the court finds that the ALJ did not evaluate the claimant's credibility regarding her subjective complaints and limitations with sufficient detail to understand the logic behind them, a reversal is required. See Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991).

Plaintiff's testimony regarding her past symptoms and the effects of her impairments are supported by the existing contemporaneous medical records. Furthermore, as described by her they mirror her current condition, which is well documented in the record. Of the listed Polaski factors, the ALJ explicitly addressed plaintiff's daily activities. (Tr. 18, 20-21.) He found that her graduating from high school, attending a "college training program", marrying, having children, and recently living independently, indicated that she was not credible regarding her symptoms during the alleged disability period.

These findings are not supported by substantial evidence, when considered in the context of the total record, including that which does not support the ALJ's findings. Several factors are instructive. Plaintiff's graduation from high school was delayed (she graduated at age 19), she had been in a special education program, and she was mediocre in many classes. (Tr. 293-96.) She attended a secretarial training school for no more than a year before leaving because she "wasn't cut out for it." (Tr. 43.) Regarding her marriage and children, neither shows that she was or was not disabled. Her children were removed from her care due to her inability to maintain an appropriate residence, and her parental rights were eventually permanently severed. (Tr. 54.)

The ALJ did not describe any of her reported symptoms between 18-22 years of age, other than to state, "There is no mention in those records of psychotic symptoms or anxiety, and . . . the [plaintiff's] impairments and limited symptoms were directly attributed to her living situation by treating sources." (Tr. 20.) The record indicates that these past symptoms are very similar to her present symptoms, for which she was found disabled in 1992. (Tr. 16-21.) These included feeling manic and very depressed, feeling anti-social, wanting to "be back in my closet again", having poor judgment skills, and not being able to deal with her abusive past. (Tr. 58-60, 73-76, 79-80.) These symptoms are substantiated by her medical records during that time which indicate that in 1979 she was on medication for her mental health condition. (Tr. 315-24.) Furthermore, in 1980 Dr. Riesdesel at Malcolm Bliss noted worsening symptoms and plaintiff disappeared for six months while reportedly hitchhiking around the country. (Tr. 316.)

Examining the record as a whole, the court concludes that the ALJ's determination that plaintiff was not credible regarding the intensity, persistence, and limiting effects of her impairments' symptoms is not supported by substantial evidence.

**B. Plaintiff's RFC**

Plaintiff argues that the ALJ erred in finding she had an RFC that allowed her to perform work at all exertional levels but was limited to simple repetitive tasks before she attained the age of 22. (Pl.'s Br. 12.) Specifically, plaintiff argues that the determination was not supported by substantial evidence, because, first, the RFC contradicts the ALJ's Step Three findings; second, the past and present medical evidence as well as plaintiff's testimony were ignored by the ALJ; and finally, the ALJ did not give controlling weight to Dr. Gesmundo's opinion. (Id.)

A claimant's RFC "is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations." Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R § 404.1545(a)(1). The ALJ determines the RFC by considering the effect of all limitations, combined, using all relevant evidence, including

medical records, observations of treating physicians, as well as the claimant's own complaints. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). A treating physician's opinion is given controlling weight if supported by objective evidence in the record. 20 C.F.R. § 404.1527(d)(2); see Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014).

In order to be a "treating physician" the physician must be treating the claimant during the time for which disability is sought. See Kettering v. Astrue, No. 4:11 CV 646 RWS-FRB, 2012 WL 3871995, at *20 (E.D. Mo. Aug. 13, 2012). A physician can make a retrospective opinion but it is only relevant to the extent it relates to the claimant's condition during the time for which benefits are sought. See Moore v. Astrue, 572 F.3d 520, 525 (8th Cir. 2009); Kettering, 2012 WL 3871995, at *20.

When a medical expert is not asked for his or her opinion on a claimant's ability to perform work-related activities, the lack of such an opinion is not substantial evidence supporting an ALJ's RFC determination. Pate-Fires, 564 F.3d at 943-44. Additionally, a credibility finding is not a substitute for medical evidence that a claimant has the RFC to perform certain work-related activities. Schumacher v. Colvin, No. 4:13 CV 351 TIA, 2014 WL 4163762, at *42 (E.D. Mo. Aug. 21, 2014) (citing Estabrook v. Apfel, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998)). The ALJ may not substitute his opinion for those of the medical experts. Pate-Fires, 564 F.3d at 946-47.

Although the ALJ is correct that the medical records from the time period in question are few and limited, the record, evaluated as a whole, unequivocally indicates a more limited RFC. Plaintiff took an IQ test in 1975, which showed an overall score of 77 (Tr. 298), which is on the low side of normal.[8] The ALJ properly categorized this as "borderline intellectual functioning." (Tr. 17.) Plaintiff was a sub-par high school student, as shown by her school transcripts, her testimony regarding being enrolled in special education classes, and her age at graduation, 19 years (indicating she was held back at least one year).

---

[8] DSM IV at 40-42.

Dr. William Riedesel at Malcolm Bliss was plaintiff's treating physician during the time in question. Therefore, his opinions should be considered as eligible for controlling weight. Accord Turpin, 750 F.3d at 993. There are no records showing that Dr. Gesmundo, plaintiff's current treating physician, saw plaintiff at any time between 1978 and 1982, and, therefore, the ALJ need not address why this doctor's opinion was not given controlling weight. See Kettering, 2012 WL 3871995, at *20.

Plaintiff saw Dr. Riedesel for treatment from December 13, 1978 to August 19, 1980. These medical records from the time in question indicate an adjustment disorder with depressed mood, and a history of schizoaffective disorder. (Tr. 324.) Additionally plaintiff's testimony regarding her history of childhood sexual abuse, harming herself, hospitalizations, and shock therapy, (Tr. 58-60, 74-76, 79-80), should have been credited, because the reasons for discrediting her testimony are not supported by substantial evidence. See infra, p. 12-14. She was seen in the ER on May 16, 1979, with suicidal thoughts as well as poor sleep and appetite. On the same day, her mental status exam indicated a mildly depressed mood, below normal intellect, and poor judgment. (Tr. 320.) Throughout 1979 she was on medication for her mental health issues. (Tr. 318, 324.)

In 1980 doctors at Malcolm Bliss noted worsening symptoms and plaintiff disappeared for six months while hitchhiking around the country. (Tr. 316.) During this time, plaintiff's doctors were never asked to opine on her ability to work and the lack of a work assessment cannot be used as substantial evidence for a RFC. See Pate-Fires, 564 F.3d at 943-44. Her poor domestic situation was mentioned in several of the treating physician's notes, but it was in addition to her mental condition. (Tr. 316, 322-23, 325.)

Plaintiff's diagnoses of borderline intellectual functioning, schizoaffective disorder, adjustment disorder, depression, poor judgment, in conjunction with the severity of her symptoms, as reported by her, are similar to the diagnoses for which she was granted disability status in 1992. (Compare Tr. 58-60, 73-76, 79-80 with 340-44, 357-61, 363-68.) The ALJ should have used the source statements and assessments by Drs. Gangure, Gesmundo, and Cross to accurately measure plaintiff's mental limitations in

concentration, persistence, and pace that she would have had between the ages of 18 and 22. This is because her illnesses and symptoms from 1978 to 1982 resemble closely her present condition. The source statements show that the RFC, found by the ALJ, limiting plaintiff to only simple and repetitive tasks at all exertional levels, is not supported by substantial evidence. This is because all of her mental limitations were not properly accounted for. The record indicates plaintiff had the same mental limitations that she currently has. These include marked and frequent problems with daily living, social functioning, concentration, persistence or pace, repeated decompensations, and only fair or poor ability in all occupational, performance, or personal-social adjustments. (Tr. 357-61, 403-07.) When the VE was given a hypothetical person with these limitations during the second ALJ hearing, she found that they would preclude the individual from the competitive job market. (Tr. 65-66.)

### C. Reverse and Award Benefits

Commissioners' final decisions not supported by substantial evidence are often remanded for reconsideration by the Administration. However, there are situations where a reversal for an immediate award of benefits is appropriate. The overall standard governing the court's discretion to reverse and award benefits is whether the record is overwhelmingly in support of a finding of disability and where remanding would merely delay the inevitable. Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000); Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997). Other considerations include how long the case has been pending before the courts. In a case that lasted six years in various levels of the Social Security Administration before the claimant died, the Eighth Circuit said that any disposition other than to reverse and award benefits "would needlessly prolong an administrative procedure that has, in large part at least because of the Administrations failings, dragged on for too long already." Fleshman v. Sullivan, 933 F.2d 674, 676-77 (8th Cir. 1991). If the ALJ fails to properly consider the claimant's subjective complaints and that fault then skews the VE's testimony regarding the availability of jobs, the proper

remedy is to reverse and award benefits in order to prevent further delay of benefits. <u>Porch v. Chater</u>, 115 F.3d 557, 572-73 (8th Cir. 1997).

The court has found that the ALJ failed to properly consider plaintiff's subjective complaints and symptoms. Because of this failure the hypothetical questioning by the ALJ of the VE was inadequate. (Tr. 64.) The VE considered two additional hypothetical persons, both of which resulted in the VE finding that plaintiff would not be able to sustain employment. (Tr. 65-66.) This case is similar to the circumstances in <u>Porch</u> where reversal with an award of benefits was appropriate. <u>See</u> 115 F.3d at 572-73.

Additionally, remanding would merely delay this case further. Plaintiff filed her case October 1, 2008, which was denied by the ALJ on March 4, 2010. He was directed by the Appeals Council to do four things, one of which, retrieving her prior SSI file from 1992, was impossible due to the record no longer existing. The ALJ then denied the claim again on December 27, 2012. Therefore, it took five and a half years for this case to reach this court. As in <u>Fleshman</u>, to delay this case further for another ALJ hearing would be an injustice.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded for the awarding of benefits. An appropriate Judgment Order is issued herewith.

         S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 5, 2014.